# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN OVERSIGHT,

                                        *Plaintiff*,

*v.*                                                        Civil Action No. 20-CV-2580-RC

U.S. POSTAL SERVICE,

                                        *Defendant*.

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

## <u>**TABLE OF CONTENTS**</u>

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.    Exemption 3: USPS Properly Redacted Information Of A Commercial Nature That Would Not Be Disclosed Under Good Business Practice ................................... 2

    A.    The calendar entries redacted under Exemption 3 contain information of a commercial nature ................................................................................... 3

        1.    The redacted calendar entries disclosed information of a commercial nature under USPS's regulations. ................................................. 3

        2.    The redacted calendar entries disclose information of a commercial nature under the ordinary meaning of the term................................... 13

    B.    Postmaster General DeJoy's calendar would not be publicly disclosed under good business practice. ................................................................... 16

    C.    The foreseeable harm standard does not apply to Exemption 3, but USPS has nevertheless demonstrated it. ................................................................ 18

II.    Exemption 5: USPS Properly Redacted Portions of Postmaster General's Calendar Under the Deliberative Process and Attorney-Client Privileges................................... 20

    A.    USPS properly withheld information under the deliberative process privilege. .. 21

        1.    The withheld information is pre-decisional. ........................................... 21

        2.    The withheld information is deliberative.................................................. 24

        3.    Releasing the withheld deliberative information would harm USPS. ...... 27

    B.    USPS properly withheld information under the attorney-client privilege. ........... 29

III.    Exemption 6: USPS Properly Withheld The Names of Job Applicants. ......................... 30

IV.    USPS Properly Adopted A Categorical Approach To Redacting Postmaster General DeJoy's Calendar ................................................................................................ 31

CONCLUSION................................................................................................................. 33

# TABLE OF AUTHORITIES

**Cases**

*Access Rep. v. DOJ,*
   926 F.2d 1192 (D.C. Cir. 1991) ............................................................... 24, 26, 27

*ACLU v. Dep't of Def.,*
   628 F.3d 612 (D.C. Cir. 2011) .......................................................................... 20

*Airline Pilots Ass'n, Int'l v. USPS,*
   No. 03-2384 (ESH), 2004 WL 5050900 (D.D.C. Jun. 24, 2004) ................................ 10, 16, 17

*Am. Immigration Council v. DHS,*
   905 F. Supp. 2d 206 (D.D.C. 2012) .................................................................... 22

*Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review,*
   830 F.3d 667 (D.C. Cir. 2016) .......................................................................... 30

*Am. Postal Workers Union, AFL-CIO v. USPS,*
   742 F. Supp. 2d 76 (D.D.C. 2010) ............................................................... *passim*

*Arthur Andersen & Co. v. IRS,*
   679 F.2d 254 (D.C. Cir. 1982) .......................................................................... 24

*Bloomberg, L.P. v. SEC,*
   357 F. Supp. 2d 156 (D.D.C. 2004) .................................................................... 32

*Braun v. USPS,*
   317 F. Supp. 3d 540 (D.D.C. 2018) ............................................................... 10, 14

*Bureau of Nat. Affs., Inc. v. DOJ,*
   742 F.2d 1484 (D.C. Cir. 1984) ........................................................................ 32

*Carlson v. USPS,*
   504 F.3d 1123 (9th Cir. 2007) .......................................................................... 13

*Climate Investigations Ctr. v. Dep't of Energy,*
   No. 16-CV-124, 2017 WL 4004417 (D.D.C. Sept. 11, 2017) ................................... 23

*Coastal States Gas Corp. v. DOE,*
   617 F.2d 854 (D.C. Cir. 1980) .......................................................................... 24

*Consumer Fed'n of Am. v. Dep't of Agriculture,*
   455 F.3d 283 (D.C. Cir. 2006) .......................................................................... 32

*Core v. USPS,*
   730 F.2d 946 (4th Cir. 1984) ............................................................................ 30

*CREW v. DOJ,*
    746 F.3d 1082 (D.C. Cir. 2014) ......................................................................................... 31

*Ctr. for Investigative Reporting v. CBP,*
    436 F. Supp. 3d 90 (D.D.C. 2019) ............................................................................ 19, 27, 28

*Ctr. for Investigative Reporting v. Dep't of Treasury,*
    No. 19-CV-08181-JCS, 2021 WL 229309 (N.D. Cal. Jan. 22, 2021) ..................................... 18

*Ctr. for Pub. Integrity v. FEC,*
    332 F. Supp. 3d 174 (D.D.C. 2018) ............................................................................ 21, 22, 26

*DBW Partners, LLC v. USPS,*
    No. CV 18-3127 (RC), 2019 WL 5549623 (D.D.C. Oct. 28, 2019) ................................. *passim*

*DBW Partners, LLC v. USPS,*
    No. CV 18-3127 (RC), 2020 WL 2064082 (D.D.C. Apr. 28, 2020) ................................ *passim*

*Dep't of Def. v. FLRA,*
    510 U.S. 487 (1994) ......................................................................................................... 30

*Fitzgibbon v. CIA,*
    911 F.2d 755 (D.C. Cir. 1990) ......................................................................................... 20

*Formaldehyde Inst. v. HHS,*
    889 F.2d 1118 (D.C. Cir. 1989) ....................................................................................... 23

*Franchise Tax Bd. of Cal. v. USPS,*
    467 U.S. 512 (1984) ......................................................................................................... 2, 5

*Gallant v. NLRB,*
    26 F.3d 168 (D.C. Cir. 1994) ........................................................................................... 31

*Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.,*
    762 F. Supp. 2d 123 (D.D.C. 2011) ................................................................................. 25

*Hunton & Williams LLP v. EPA,*
    248 F. Supp. 3d 220 (D.D.C. 2017) ................................................................................. 29

*ICM Registry, LLC v. DOC,*
    538 F. Supp. 2d 130 (D.D.C. 2008) ................................................................................. 22

*In re Anthem, Inc. Data Breach Litig.,*
    236 F. Supp. 3d 150 (D.D.C. 2017) ................................................................................. 22

*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997) ......................................................................................... 25

iii

*Johnson v. Exec. Office for U.S. Attorneys,*
    310 F.3d 771 (D.C. Cir. 2002) .......................................................................... 13

*Judicial Watch, Inc. v. Dep't of Commerce,*
    375 F. Supp. 3d 93 (D.D.C. 2019) ........................................................ 19, 20, 29

*Judicial Watch v. Export-Import Bank,*
    108 F. Supp. 2d 19 (D.D.C. 2000) ..................................................... 23, 24, 25, 26

*Mead Data Cent., Inc. v. U.S. Dep't of the Air Force,*
    566 F.2d 242 (D.C. Cir. 1977) .......................................................................... 13

*Montrose Chemical Corp. of Ca. v. Train,*
    491 F.2d 63 (D.C. Cir. 1974) ............................................................................ 25

*Nat'l Ass'n of Criminal Def. Lawyers v. Dep't of Just. Exec. Office for U.S. Attorneys,*
    844 F.3d 246 (D.C. Cir. 2016) .......................................................................... 15

*Nat'l Ass'n of Greeting Card Publishers v. USPS,*
    462 U.S. 810 (1983) ...................................................................................... 2, 5

*Nat'l Easter Seal Soc. v. USPS,*
    656 F.2d 754 (D.C. Cir. 1981) ........................................................................ 2, 5

*Neary v. FDIC,*
    104 F. Supp. 3d 52 (D.D.C. 2015) .................................................................... 31

*PEER v. Office of Science & Tech. Policy,*
    881 F. Supp. 2d 8 (D.D.C. 2012) ................................................................ 25, 26

*Physicians for Human Rights v. Dep't of Def.,*
    675 F. Supp. 2d 149 (D.D.C. 2009) .................................................................. 31

*Piper & Marbury, L.L.P. v. USPS,*
    No. CIV.A. 99-2383JMFCKK, 2001 WL 214217 (D.D.C. Mar. 6, 2001) ...................... *passim*

*Prop. of the People, Inc. v. OMB,*
    330 F. Supp. 3d 373 (D.D.C. 2018) .................................................................. 27

*Pub. Citizen, Inc. v. DOE,*
    388 F. Supp. 3d 29 (D.D.C. 2019) ................................................................ 29, 30

*Quarles v. Dep't of the Navy,*
    893 F.2d 390 (D.C. Cir. 1990) .......................................................................... 25

*Rosenberg v. Dep't of Def.,*
    342 F. Supp. 3d 62 (D.D.C. 2018) ................................................................ 19, 20

*Salisbury v. United States*,
    690 F.2d 966 (D.C. Cir. 1982) ................................................................. 26

*Stein v. SEC*,
    266 F. Supp. 3d 326 (D.D.C. 2017) ......................................................... 19

*Taxation With Representation Fund v. IRS*,
    646 F.2d 666 (D.C. Cir. 1981) ................................................................. 24

*Wickwire Gavin, P.C. v. USPS*,
    356 F.3d 588 ................................................................................................ 5

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007) ...................................................... *passim*

**Statutes**

39 U.S.C. § 410(c)(2) ................................................................ 2, 4, 14, 17

**Regulations**

39 C.F.R. § 265.14(b) .................................................................... *passim*

83 Fed. Reg. 48233 ............................................................................ 4, 5

**INTRODUCTION**

In its opening brief, the United States Postal Service ("USPS" or "Postal Service") explained how it properly redacted different categories of entries on Postmaster General Louis DeJoy's electronic work calendar under FOIA Exemptions 3, 5, 6, and 7(c).  Plaintiff American Oversight now challenges the redactions USPS made under Exemptions 3 and 5, and some of the redactions made under Exemption 6.  It further attacks USPS's use of the categorical approach to redacting the calendar, which courts within this Circuit have repeatedly blessed.

Plaintiff's arguments are rooted in cramped readings of the relevant exemptions.  Most notably, American Oversight contends that little if any information in the personal calendar of the Postal Service's top executive officer is likely to be of a commercial nature.  But that argument is belied by Plaintiff's characterization of its own broad request, USPS's supporting affidavits, and common sense.  In fact, large swathes of the calendar contain commercial information under both the plain meaning of the term and USPS's regulations.  Because USPS's private sector competitors would never release similar information, good business practice requires that USPS similarly abstain from releasing it.  Congress has expressly permitted USPS to withhold such commercially-sensitive information in order to comply with its mandate to operate like a business.

Plaintiff's remaining attacks on USPS's exemptions are similarly flawed.  Exemption 5 exists to protect the integrity of agency deliberations and the attorney-client privilege.  American Oversight contends little harm would occur from making public a record detailing the strategic deliberations and communications of the Postal Service at the highest level over a five month period.  But USPS and its affiants have established that, in limited circumstances, releasing calendar entries would cause great harm to the Postal Service by disclosing confidential deliberations and chilling candid communications.  Plaintiff similarly suggests that it is harmless to identify successful job interviewees who met with the Postmaster General, but identifies no public interest in the release of such information.  Finally, Plaintiff attacks the manner in which USPS has redacted the calendar at issue, even though courts have repeatedly approved of USPS's approach.   The Court should credit USPS's extensive and detailed affidavit support for its

1

redactions and grant USPS's motion for summary judgment that the redactions are appropriate.

**ARGUMENT**

I.    *Exemption 3:* **USPS Properly Redacted Information Of A Commercial Nature That Would Not Be Disclosed Under Good Business Practice**

Congress has repeatedly commanded that USPS operate like a private enterprise in a competitive marketplace rather than as a government agency. *See, e.g.*, *Franchise Tax Bd. of Cal. v. USPS*, 467 U.S. 512, 520 (1984) (Postal Reorganization Act reformed USPS to "be run more like a business than had its predecessor, the Post Office Department"); *Nat'l Ass'n of Greeting Card Publishers v. USPS*, 462 U.S. 810, 822 (1983) (noting that under the Postal Reorganization Act "Congress sought to ensure that the Postal Service would be managed in a 'businesslike way'" (citation omitted)). To that end, Congress passed the Postal Reorganization Act ("PRA"), which provides USPS a "broad exemption" to federal laws constraining other agencies. *Nat'l Easter Seal Soc. v. USPS*, 656 F.2d 754, 767 (D.C. Cir. 1981) (citing S. Rep. 91-912 (1970)). As relevant here, the PRA relieves USPS from making public "information of a commercial nature . . . which under good business practices would not be disclosed." 39 U.S.C. § 410(c)(2). This exemption "designates a broad swath of documents as protected[.]" *DBW Partners, LLC v. USPS*, No. CV 18-3127 (RC), 2020 WL 2064082, at *4–5 (D.D.C. Apr. 28, 2020) ("*DBW II*").

USPS's opening brief and supporting affidavits explained how the PRA's broad exemption applied to nine specific categories of calendar entries on Postmaster General DeJoy's calendar between June 1, 2020 and November 7, 2020. *See* ECF No. 14 ("Def.'s Mem.") at 10-22; *see also* ECF No. 14-2 ("Castorina Decl.") ¶¶ 28-29, 33-34, 38-39, 45-46, 48-51, 52-55, 56-59, 60-64, 65-68. Plaintiff, in response, does not dispute that the PRA is a withholding statute as defined by Exemption 3, and thus permits USPS to withhold commercial information that would not be released under good business practices. *See* ECF No. 18 ("Pl.'s Mem.") at 11 n.7. Plaintiff instead makes three arguments: (1) that some or most of the information withheld from Postmaster General DeJoy's calendar does not qualify as "commercial information" (Pl.'s Mem. at 13-26); (2) that some withheld information likely would be released under good business practices (*id.* at 27-29);

2

and (3) that USPS has not shown foreseeable harm from release of the information (*id.*at 29-32). But Plaintiff's arguments neglect the sensitivity around releasing the hour-by-hour activities of USPS's top executive over a five month period, something that the Postal Service's competitors, "such as United Parcel Service and Federal Express, would not reveal" under good business practice. ECF No. 14-3 ("Seaver Decl.") ¶ 7. For the reasons below, the Court should reject Plaintiff's arguments and find that USPS's Exemption 3 withholdings are proper.

### A. The calendar entries redacted under Exemption 3 contain information of a commercial nature.

As USPS explained in its opening brief, courts consider both plain meaning and USPS's regulations when assessing whether information is "commercial" under the PRA. *See* Def.'s Mem. at 13-14. Both approaches support a finding that the withheld information here is commercial in nature. *Id.* at 13-19. In addition to the common-sense fact that much of the daily schedule of a competitive enterprise's top executive is commercially-sensitive, USPS also explained how the information qualifies as commercial under USPS's regulations. *Id.* at 15-19. Those regulations define commercial information as "relate[ing] to commerce, trade, profit, or the Postal Service's ability to conduct itself in a businesslike manner" and further provide a set of six non-exclusive factors for determining whether information is commercial. *See* 39 C.F.R. § 265.14(b). Maintaining the confidentiality of the Postmaster General's strategic business meetings, discussions with confidants and other USPS leaders, and negotiations with labor unions and third-party businesses all concern USPS's "ability to conduct itself in a businesslike manner," and further each of the six factors support a finding that the information withheld from the calendar under Exemption 3 is commercial. *See* Def.'s Mem. at 15-19. Plaintiff nonetheless argues that this information is not commercial under either USPS's regulations. *See* Pl.'s Mem. at 13-27.

#### 1. *The redacted calendar entries disclosed information of a commercial nature under USPS's regulations.*

Plaintiff begins by discussing minor revisions to USPS's regulations defining the scope of "commercial" information. *See* Pl.'s Mem. at 13-16. But this is beside the point, as there is no dispute that USPS applied the current regulations both in its Final Response to American Oversight

and in its opening brief. *See* Castorina Decl., Exs. 1-2; Def.'s Mem. at 15-19. Moreover, both USPS's prior and current regulations define commercial information by adopting the text of the PRA, which permits USPS to withhold "information of a commercial nature, including trade secrets, whether or not obtained from a person outside the Postal Service, which under good business practice would not be publicly disclosed." 39 U.S.C. § 410(c)(2); *compare* 39 C.F.R. § 265.14(b)(3) (Oct. 23, 2018) *with* 39 C.F.R. § 265.14(b)(3) (Mar. 6, 2018).

USPS's prior regulations offered eight non-exclusive examples of such commercial information, including records that "would be of potential benefit to persons or firms in economic competition with the Postal Service." 42 C.F.R. § 265.14(b)(3)(vi) (Mar. 6, 2018). The current version maintains the statutory text from the PRA but adds that information is "of a commercial nature if it relates to commerce, trade, profit, or the Postal Service's ability to conduct itself in a businesslike manner." 39 C.F.R. § 265.14(b)(3). It also provides six non-exclusive factors to consider in assessing information, including whether such information "[w]ould be of potential benefit to individuals or entities in economic competition with the Postal Service . . . or could be used to cause harm to a commercial interested of the Postal Service." *Id.* § 265.14(b)(3)(i)(C).[1]

During the rulemaking process for these revised regulations, one commenter claimed that the regulations were "so broad as to be meaningless," to which USPS responded that the addition of six factors "to apply in making a determination of information's commercial nature provide further clarity to the proposed definition[.]" 83 Fed. Reg. 48233, 48234. USPS opined that the new rule was "considerably narrower" than the existing broad language and explained that the factors reflected "several characteristics that [courts] tend to weigh" in assessing whether information is commercial, including whether the information "[i]s publicly available, is intrinsically economic or financial, is transactional, involves cost and pricing, would be useful to competitors, or could cause competitive harm if disclosed." *Id.* (collecting cases). In other words, the new rule readopted the PRA's broad statutory language and then provided six factors reflecting

---

[1] The current regulations also provide 21 non-exclusive examples of commercial information. *See id.* § 264.15(b)(3)(ii)(A)-(U).

existing case law on the topic to clarify the meaning of that language.  *Id.*[2]

Plaintiff seizes upon the "considerably narrower" language in the notice-and-comment response and suggests it should control the Court's review.  *See* Pl.'s Mem. at 16.  But Plaintiff's effort to limit the scope of the exemption ignores that "Congress spoke loudly through the Postal Reorganization Act, providing USPS with a broad release from many FOIA disclosure requirements with which other agencies must comply."  *Wickwire Gavin, P.C. v. USPS*, 356 F.3d 588, 592-593; *see also Nat'l Easter Seal Soc.*, 656 F.2d at 767 (describing the "broad exemption" provided to USPS under PRA).  And it further neglects Congress's repeated exhortation that USPS operate like a private enterprise.  *See, e.g.*, *Franchise Tax Bd.*, 467 U.S. at 520; *Nat'l Ass'n of Greeting Card Publishers*, 462 U.S. at 822.  The exemption is therefore not narrow *per se*, as Plaintiff repeatedly suggests (*see, e.g.*, Pl.'s Mem. at 10, 12, 21); instead, the 2018 revisions merely adopted factors previously considered by courts to provide "clear, concise…parameters" on a broad statutory exemption.[3]  *See* 83 Fed. Reg. at 48234 (recognizing the "nearly boundless" text of the exemption in the PRA); *see also DBW II*, 2020 WL 2064082 at *4 (PRA "designates a broad swath of documents as protected" from release).  Here, the Court need only consider the plain text of the factors set out by USPS and the ordinary meaning of the term "commercial information." *See Am. Postal Workers Union, AFL-CIO v. USPS*, 742 F. Supp. 2d 76, 81 (D.D.C. 2010); *see also* Def.'s Mem. at 15-19.

Turning to substance, Plaintiff argues that the information USPS has withheld under

---

[2] If anything, the revisions strengthen USPS's position by adding that information is of a commercial if it relates to the Postal Service's ability "to conduct itself in a businesslike manner." 39 C.F.R. § 265.14(b)(3).  USPS's declarants stressed that releasing the calendar details of the Postal Service's top executive would harm the agency's ability to operate in a businesslike manner and that similar businesses do not conduct themselves in such a way.  *See, e.g.*, Seaver Decl. ¶¶ 5-7; Castorina Decl. ¶¶ 33, 38, 45, 49, 53, 57, 61.

[3] Contrary to Plaintiff's argument, USPS never suggested that either the PRA or USPS's regulations allowed for a "[l]imitless [c]ategory" (Pl.'s Mem. at 13) of documents to be withheld as commercial information.  To the contrary, at every relevant stage of this litigation USPS has stressed that it redacted information as commercial after considering the factors in the regulations Plaintiff cites.  *See* Castorina Decl., Ex. 2 (Final Response) at 1 (39 C.F.R. § 265.14(b)(3)); Def.'s Mem. at 15-19 (discussing relevance of each factor).

Exemption 3 falls beyond the scope of its regulations defining commercial information. *See* Pl.'s Mem. at 16-24. It first alleges that calendar entries are not suitable for wholesale or blanket redactions. *Id.* at 16-17. But USPS did not apply blanket redactions, and instead considered the six factors set out in its regulations for each entry. *See* Castorina Decl., Ex. 2 (Final Response) at 1; Def.'s Mem. at 15-19. Plaintiff's argument neglects that dozens of calendar entries that are not redacted, while many more are only partially redacted. *See generally* Castorina Decl., Ex. 3 (Calendar). More importantly, while Plaintiff concedes that at least "select information within a calendar entry could constitute exempt information," Pl.'s Mem. at 17, it ignores the unique and commercially-sensitive nature of the document it has requested—a calendar that reflects the strategic priorities, time allocation, delegations, assignments, oversight, and movement of the top executive of an agency tasked by Congress with competing in a private marketplace. *See* Castorina Decl. ¶ 18.[4] Indeed, American Oversight's brief admits it seeks information about the Postmaster General's "actions," "priorities," and "influences," acknowledging that the calendar contains commercially sensitive information about USPS's management and operations and that Plaintiff seeks that very information. *See* Pl.'s Mem. at 2.

Plaintiff next addresses each of the six individual factors in USPS's regulations. *See* Pl.'s Mem. at 17-24. As to the *first* and *second* factors, Plaintiff quibbles with USPS's assertion that details about strategy and business meetings for USPS's products "relate[] to products or services subject to economic competition" or to "activities that are analogous to a private business in the marketplace." 39 C.F.R. § 265.14(b)(3)(i)(A)-(B). *See* Pl.'s Mem. 17-18. According to Plaintiff, "just because the content of a meeting may have addressed commercial information," does not

---

[4] For that reason, Plaintiff's reliance on *Piper & Marbury, L.L.P. v. USPS*, No. CIV.A. 99-2383JMFCKK, 2001 WL 214217, at *5 (D.D.C. Mar. 6, 2001) is unhelpful. The court there found that USPS could not withhold an entire contract under the PRA where USPS offered insufficient explanation about the commercial sensitivity of various "innocuous" contract provisions that could "be found in any form book in a law library." *Id.* By contrast, even while some of Postmaster General DeJoy's meetings may be on publicly-known topics, his individual calendar entries and their details are available only to a narrow circle of individuals within USPS. *See* Castorina Decl. ¶ 10; Seaver Decl. ¶ 9.

mean the details of that meeting, including its timing, participants, topic, and whether similar meetings occur in the future, *reveal* such commercial information. *Id*. But on its face a meeting about USPS's products or services "relates to products or services subject to economic competition." 39 C.F.R. § 265.14(b)(3)(i)(A); *see also* Related, Black's Law Dictionary (11th ed. 2019) ("Connected in some way; having relationship to or with something else"). That is consistent with the regulation's broader rule that "[i]nformation is of a commercial nature if it relates to commerce, trade, profit, or the Postal Service's ability to conduct itself in a businesslike manner." 39 C.F.R. § 265.14(b)(3). Information about strategy and business meetings, such as who attended and what was discussed, similarly relates to products or services subject to economic competition.

Plaintiff's argument confuses the issue by suggesting that meeting details must reveal the substance of the meeting to qualify as commercial information. *See* Pl.'s Mem. at 18 (arguing that "just because the content of a meeting may have addressed commercial information . . . does not mean that the sparse information contained in a calendar entry reveals the same"). But that is not what USPS's regulations require, instead asking the agency to consider whether the meeting details are "[c]onnected in some way" with USPS's competitive products or competition in the private marketplace, thus indicating the information is commercial in nature. *See* Related, Black's Law Dictionary (11th ed. 2019); *see also* 39 C.F.R. § 265.14(b)(3)(i)(A)-(B). Even if Plaintiff was correct, it is still the case that meeting details do reveal important substantive aspects of the meeting, including which executives are responsible for the topic; when, how frequently, and for how long the Postal Service discussed and worked on an issue; and whether certain issues or topics are priorities to the Postmaster General. *See, e.g.*, Castorina Decl. ¶¶ 34, 46. Plaintiff therefore fails to rebut that the first and second factors weigh in favor of USPS's withholdings because many of the categories of meetings on Postmaster General DeJoy's calendar related to USPS's products or to activities analogous to those of private enterprise. *See* Def.'s Mem. at 15-16.

As to the *third* factor, Plaintiff argues that much of the redacted information likely does not benefit USPS's competitors or harm USPS's commercial interests because of "the limited

substance in the information withheld."   Pl.'s Mem. at 18-21 (citing 39 C.F.R. §
265.14(b)(3)(i)(C)).  That argument is belied by the breadth of Plaintiff's own request, which seeks
at its core to know what the Postmaster General did, who he spoke with, and what he spoke about,
for every hour of every day over a five month period.  *See* Compl. ¶ 7; *see also* Pl.'s Mem. at 2
(admitting the request seeks information about the Postmaster General's "actions," "priorities,"
and "influences").  As Ms. Castorina explained, the calendar "includes a wide range of details
about the Postmaster General's daily activities with respect to the strategic, business, logistical,
operational, legal, and labor-related activities of the Postal Service." Castorina Decl. ¶ 18.  It
offers insight into the Postmaster General's "strategic priorities, what he dedicates his attention to,
who he confers with about different aspects of Postal Service business and operations, and what
his role is in [the] Postal Service decision and policy making process." *Id.*  Such insight into the
activities of a competitive enterprise's top leadership is of immense value to its competitors,
offering a wealth of competitive insight to the Postal Service's rivals.  As Ms. Seaver explained,
competitors such as United Parcel Service and Federal Express would never release such
information about their own chief executives.  *See* Seaver Decl. ¶¶ 6-7.

Plaintiff fixes upon the example of the Postmaster General's role in hiring other leaders at
the Postal Service.  *See* Pl.'s Mem. at 19.  It contends there is no risk of competitive harm in
releasing such information because USPS could still use Exemption 6 to redact the identities of
unsuccessful job applications, revealing only successful job applicants whose identities will in any
event become known.  *Id.*  But that misses the point.  What benefits USPS's competitors is not
knowing who ultimately fills a role, but rather gaining insight into when the Postmaster General
becomes involved in the hiring process and what roles demand his attention in the hiring process.
As Ms. Castorina explained, this information reveals USPS's "hiring practices, hiring priorities,
its judgment about what jobs are necessary to compete in the marketplace, the Postmaster
General's role in the hiring process, how many candidates the Postal Service interviews for certain
roles, as well as the identities of leading candidates for open positions." Castorina Decl. ¶ 66.  The
information is particularly sensitive here because the Postmaster General is most likely to be

involved in hiring for the most senior and important roles at USPS.  *Id.*  While certain aspects of the hiring process may be public (*e.g.*, certain job openings, identities of successful applicants), the Postmaster General's role in that process is not.  *Id.*

Further discussing the third factor, Plaintiff attacks the Postal Service's explanation that its competitors could use Postmaster General DeJoy's calendar in combination with public information to discern USPS business strategy.  *See* Pl.'s Mem. at 19-20.  According to Plaintiff, this explanation is "illogical" because public events merely confirm that the Postmaster General likely participated in meetings about such events.  *Id.*  But this, too, misses the point.  While a competitor might reasonably infer that USPS held meetings on a given  business initiative prior to its announcement, releasing the Postmaster General's calendar offers insight of a different kind, including information about the Postmaster General's "key business priorities, the identities of executives tasked with pursuing those priorities, and elements of the Postmaster General's strategic judgment."  Castorina Decl. ¶ 28.  A similarly-situated private enterprise would not reveal details about its internal meetings or discussions about even a much-heralded public initiative, as such information offers competitive insight into company strategy and decision-making.  *See* Seaver Decl. ¶¶ 5-6; Castorina Decl. ¶¶ 18, 28, 31, 36.  Indeed, this Court has rejected the argument that information is subject to release under the PRA merely because it relates to facts that are "either publicly known or easily discernible."  *DBW Partners, LLC v. USPS*, No. CV 18-3127 (RC), 2019 WL 5549623, at *8 (D.D.C. Oct. 28, 2019) ("*DBW I*") (recognizing that "most modern businesses would not publicize sensitive trade information even if it was already public in some limited form"); *cf. Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) ("[T]he fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption.").[5]

---

[5] Plaintiff also acknowledges that meetings between the Postmaster General and the Office of Inspector General ("OIG") "could address . . . an audit of USPS business operations."  Pl.'s Mem. at 20.  Indeed, as Ms. Castorina explained, these meetings typically concern audits of "Postal Service business operations, technology systems, Congressional reports, and final audit reports."  Castorina Decl. ¶ 57.  OIG reports usually "concern commercial aspects of the Postal Service's

Perhaps recognizing that this factor weighs strongly in USPS's favor, American Oversight entirely dismisses pre-2018 case law discussing this factor because of the revisions to USPS's regulations.  *See* Pl.'s Mem. at 19 (claiming pre-2018 case law based on "defunct" regulations). But that argument goes too far.  The revisions at issue retained the same statutory definition of commercial information and merely moved this category of documents—records of potential benefit to persons or firms in competition with USPS—from a non-exhaustive list of examples of commercial information to a non-exclusive list of factors in identifying commercial information. *See supra* at 3-5.  It therefore remains the case that the withheld calendar entries—which USPS's competitors would never reveal—are commercial in nature.  *See Am. Postal Workers Union*, 742 F. Supp. 2d at 81; *Airline Pilots Ass'n, Int'l v. USPS*, No. 03-2384 (ESH), 2004 WL 5050900, at *6 (D.D.C. Jun. 24, 2004); *Braun v. USPS*, 317 F. Supp. 3d 540, 549 (D.D.C. 2018).  Plaintiff's argument further overlooks that in *Am. Postal Workers Union*, the court also found the information at issue to be commercial "under a common understanding of the word," 742 F. Supp. 2d at 81, further reinforcing that information is, naturally, "commercial" where it would aid a competitor. The third factor therefore weighs in favor of USPS's withholdings.  *See* Def.'s Mem. at 16-17.

Plaintiff next suggests that the *fourth* factor—whether the information is proprietary or includes conditions or protections on distribution and disclosure—has "little relevance here."  Pl.'s Mem. at 21.  Not so.  The Postal Service, unsurprisingly, treats the Postmaster General's discussions and meetings with the utmost sensitivity.  As Ms. Seaver explained, "[m]eetings and discussions with the Postmaster General are presumed confidential by other USPS leaders and employees."  Seaver Decl. ¶ 8.  Accordingly, the "subject matter, agenda, conversation, or results of such meetings would not be shared within USPS, and certainly not outside of USPS, save where warranted by good business practice."  *Id.*  The Postal Service also limits access to the Postmaster

---

operations, such as contracting, facilities management, delivery and processing, finance, and technology."  *Id.* ¶ 58.  Plaintiff muses that meetings between the Postmaster General and OIG may also have concerned topics like ethics conflicts or election mail because the OIG issued reports on these topics, but fails to explain why such meetings are likely to be on the Postmaster General's calendar.  *See* Pl.'s Mem. at 20-21.

General's calendar to a small circle of aides, further reflecting "conditions or protections on distribution and disclosure." 39 C.F.R. § 265.14(b)(3)(i)(D); *see* Castorina Decl. ¶ 10; Seaver Decl. ¶ 9. And it goes without saying that all enterprises, public or private, place extensive safeguards on access to their digital information and systems, including electronic mail and calendars.

Plaintiff sweeps all that to the side and suggests this factor does not favor USPS because the calendar is not "proprietary." Pl.'s Mem. at 21. But this factor on its face is not limited to proprietary information, and USPS's declarants have supplied credible explanations that USPS treats the calendar confidentially and takes steps to limit its accessibility. 39 C.F.R. § 265.14(b)(3)(i)(D); *see* Castorina Decl. ¶ 10; Seaver Decl. ¶ 9. American Oversight repeats its point that details of the Postmaster General's meetings may ultimately become public at a later time. But even then, USPS would not release the corresponding calendar entries from the Postmaster General's schedule. *See* Castorina Decl. ¶ 10; Seaver Decl. ¶ 9. Plaintiff again leans on the "narrower" language from the 2018 rulemaking, *see* Pl.'s Mem. at 21, eliding the fact that the new rule merely sought to offer greater clarity about a broad exemption to the FOIA laws. *See supra* at 3-5. Plaintiff does not rebut USPS's argument that the fourth factor weighs in favor of finding the withheld information to be commercial. *See* Def.'s Mem. at 17-18.

American Oversight does not dispute that the *fifth* factor—information that "is the result of negotiations, agreements, contracts or business deals between the Postal Service and a business entity," 39 C.F.R. § 265.14(b)(3)(i)(E)—favors USPS, and instead merely splits hairs over the fact that Defendants' papers inadvertently used the term *concerns* rather than *results*. *See* Pl.'s Mem. at 21-22. But plainly, the Postmaster General's meetings with "the customers, business partners, or potential business partners of the Postal Service," Castorina Decl. ¶ 49, are meetings and discussions that "result" from "negotiations, agreements, contracts, or business deals between the Postal Service and a business entity" 39 C.F.R. § 265.14(b)(3)(i)(E). As a matter of common sense, even where no formal agreement is yet in place, the Postmaster General's meeting with a business entity indicates some form of prior negotiation about a prospective contract, joint venture,

11

or business opportunity.[6]  As Ms. Castorina explained, the "mere fact that a meeting involves [USPS's] top executive indicates that the subject is important to [USPS] and requires the attention of leadership at the highest level."  Castorina Decl. ¶ 29.  And as she further explained, any meeting with the Postmaster General is commercially-sensitive, as it reveals "who the Postal Service is doing business with or approaching for business" and impacts USPS's "ability to conduct confidential negotiations with third parties, or to reach out to customers in confidence."  *Id.* ¶ 50.  Plaintiff offers only pedantry on this point and does not substantively dispute that many of the Postmaster General's appointments concern discussions resulting from negotiations or agreements with business entities.  Accordingly, this factor continues to weigh strongly in favor of USPS.  *See* Def.'s Mem. at 18.

USPS explained in its opening brief that the *sixth* factor—whether the information "[r]elate[s] primarily to the Postal Service's governmental functions or its activities as a provider of basic public services," 39 C.F.R. § 265.14(b)(3)(i)(F)—similarly weighed in favor of withholding because the vast majority of entries of the Postmaster General's calendar concern the commercial activities of USPS.  *See* Def.'s Mem. at 18.  USPS also explained that meetings with other public entities, such as the Board of Governors or Members of Congress often concerned USPS's business strategy, products and services, operations, fiscal status, and budgetary needs.  *Id.*; *see also* Castorina Decl. ¶¶ 32-34, 60-64.  Plaintiff claims that it "beggars belief" that more entries on the Postmaster General's calendar would not exclusively concern public functions, *see* Pl.'s Mem. at 22-24, but this argument ignores that even meetings touching upon matters of public concern are likely to be inextricably intertwined with commercially-sensitive information related to postal rates, funding, operations, and logistics.  *See DBW II*,2020 WL 2064082, at *3 (explaining

---

[6] Even if such meetings were, somehow, purely spontaneous encounters between the Postmaster General and another business entity, the details of such meetings are *still* commercial information because they would concern USPS competitive products and services, "activities that are analogous to a private business in the market place," and would represent the kind of market intelligence that "[w]ould be of potential benefit to individuals or entities in economic competition with the Postal Service."  39 C.F.R. § 265.14(b)(3)(i)(A)-(C).

that non-segregable, "inextricably intertwined" exempt portions of records may be withheld (quoting *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002))); *see also Am. Postal Workers Union*, 742 F. Supp. 2d at 83 (citing *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)).  Plaintiff admits, for example, that meetings with the Board of Governors are likely to "address . . . an audit of certain USPS business operations," Pl.'s Mem. at 20, and such operations are typically bound up with matters of public concern, such as postal rates or delivery time, *see* Castorina Decl. ¶¶ 57-58.  American Oversight offers no persuasive reason to believe that the calendar contains entries exclusively addressing matters of public concern without any corresponding commercial sensitivity.

In sum, the factors adopted by the agency for identifying commercial information strongly support USPS's withholdings here, particularly in view of Congress's demand that USPS operate in the same manner as a private enterprise.

2.      *The redacted calendar entries disclose information of a commercial nature under the ordinary meaning of the term.*

USPS's opening brief also explained how the withheld information is commercial under the ordinary meaning of the word.  *See* Def.'s Mem. at 14-15.  Even though USPS has previously issued regulatory guidance on the scope of commercial information, courts nonetheless often assess USPS's withholdings under the PRA using "a common understanding of the word." *Am. Postal Workers Union*, 742 F. Supp. 2d at 81; *see also Carlson v. USPS*, 504 F.3d 1123, 1128 (9th Cir. 2007) (defining the term as "relat[ing] to commerce, trade, or profit").  Plaintiff does not directly address this plain-meaning approach, but instead argues that prior decisions assessing the PRA's commercial information exemption do not support finding the information here to be commercial.  *See* Pl.'s Mem. at 24-27.  That is not correct.

American Oversight chiefly argues that these earlier cases mostly "address[ed] types of proprietary information." *Id.*  Evan if that is accurate, it is purely a function of the different kinds of information requested in those cases as compared to this one—nothing in the PRA or USPS's regulations limits commercial information solely to proprietary information.  *See* 39 C.F.R. §

13

265.14(b)(i)(D) (identifying whether information is "proprietary *or* includes conditions or protections on distribution and disclosure" as one relevant factor); *see generally* 39 U.S.C. § 410(c)(2).  Plaintiff's argument focuses solely on the differences between the records in those earlier cases and the calendar here, but ignores the *reasoning* those cases employed.  For example, the court in *Braun v. USPS* found that the unique data identifies at issue qualified as commercial information under the PRA because of Ms. Castorina's explanation that USPS "operates in a competitive market in which it must protect its information system and related proprietary information." 317 F. Supp. 3d at 549 (citing declaration of Janine Castorina).  Similarly, the Court in *Am. Postal Workers Union* found employee compensation data to be commercial information both because it "would be of potential benefit to persons or firms in economic competition with the Postal Service"—the third factor under USPS's regulations—and because USPS explained that the data reflected efforts to "improve customer service, generate revenue, manage costs and enhance a performance-based culture." 742 F. Supp. 2d at 81.  USPS's declarants here have similarly explained that the information redacted from Postmaster General DeJoy's calendar under Exemption 3 impacts USPS's ability to operate in a competitive market and provide competitive service.  *See* Seaver Decl. ¶¶ 5-7; *see also* Castorina Decl. ¶¶ 18, 28, 33, 38, 45, 49, 57.

Plaintiff next argues that courts require the Postal Service to demonstrate why the specific information contained in a record constitutes commercial information.  *See* Pl.'s Mem. at 25-26 (citing *DBW I*, 2019 WL 5549623, at *9; *Piper & Marbury*, 2001 WL 214217, at *5).  But that is exactly what USPS did.  Ms. Castorina has provided a detailed declaration identifying each individual category of information withheld, and explaining the basis for each exemption asserted over that category.  *See generally* Castorina Decl.  Contrary to American Oversight's claims, USPS has not taken the position that the calendar, as a whole, can be withheld.[7]

---

[7] Although USPS does not assert that position here, a strong argument exists that the calendar could be withheld in full under Exemption 3 in view of Ms. Castorina's explanation that "the calendar as a whole is commercially sensitive because it offers a view into a five-month period of the Postal Service's top leadership."  Castorina Decl. ¶ 18 (further explaining that the "calendar includes a wide range of details about the Postmaster General's daily activities with respect to the

This case is therefore different than *DBW I*, where the Court found that USPS had, initially, not been "reasonably specific" in explaining its redactions to a USPS Office of Inspector General ("OIG") whitepaper.  *DBW I*, 2019 WL 5549623, at *8.   There, the agency's declarant initially only offered a few paragraphs of explanation that generally addressed the commercial-sensitivity of the whitepaper as a whole.  *See DBW*, Case No. 1:18-cv-3127-RC, ECF No. 11-3 at 4-6 (discussing commercial sensitivity of whitepaper at a general level); *see also DBW I*, 2019 WL 5549623, at *9 (finding the initial declaration "adequately explain[ed] that the OIG Whitepaper contains *some* commercial information that falls under the FOIA exemption in the Postal Reorganization Act" (emphasis in original)).   By contrast, Ms. Castorina here offers extensive support for each specific category of information withheld.  *See generally* Castorina Decl.

Her declaration is therefore more akin to the agency's second declaration in *DBW II*, which provided "a section-by-section review of the contents of the Whitepaper and of the reasons why . . . much of the information contained therein is exempt from disclosure."  *DBW II*, 2020 WL 2064082, at *6; *see also DBW*, Case No. 1:18-cv-3127-RC, ECF No. 19-1 at 7-23 (offering section-by-section explanation of redactions in whitepaper).  The Court found that section-by-section approach, subject to several minor exceptions, "suffice[d] to carry the agency's burden on segregability."  *Id.* at 7 (further explaining the declaration provided a "lengthy section-by-section analysis" of the Whitepaper explaining "what kind of business sensitive information appears therein"); *see also Nat'l Ass'n of Criminal Def. Lawyers v. Dep't of Just. Exec. Office for U.S. Attorneys*, 844 F.3d 246, 257 (D.C. Cir. 2016) (finding section-by-section review for segregability appropriate for lengthy documents).  Ms. Castorina's declaration provides even greater detail than this second declaration in *DBW II*, *compare* Castorina Decl. *with DBW*, Case No. 1:18-cv-3127-RC, ECF No. 19-1, and therefore also suffices to carry the agency's burden.

---

strategic, business, logistical, operational, legal, and labor-related activities of the Postal Service"). And as further explained *infra* in Section IV, courts have repeatedly held that some agency calendars may not even qualify as public records under FOIA.  USPS here agreed to produce Postmaster DeJoy's calendar subject to redactions.

**B.      Postmaster General DeJoy's calendar would not be publicly disclosed under
good business practice.**

American Oversight next argues that, even if the withheld information is all "commercial,"

some portions of it would nonetheless be released under good business practices.  *See* Pl.'s Mem.

at 27-29.  But it is hard to imagine when it would ever be a good business practice for a private

enterprise to voluntarily release the personal calendar of its top executive.  *See* Seaver Decl. ¶¶ 6-

8.  Plaintiff first focuses specifically on meetings involving "other federal executive offices and

agencies," arguing that while these meetings may be sensitive, even a private enterprise should

expect that the government might release the details of such meetings.  *Id.* at 27.  But as American

Oversight itself acknowledges, in assessing good business practice, "courts typically 'look[] to the

commercial world, management techniques, and business law, as well as to the standards of

practice adhered to by large corporations."  *Id.* at 28 (quoting *Airline Pilots Ass'n*, 2004 WL

5050900, at *6).  The question, therefore, is not whether a private enterprise meeting with a

government office has a reasonable expectation that the meeting will remain confidential, but

rather whether the private enterprise itself would—as a matter of good business practice and in

view of the "standards of practice adhered to by large corporations"—affirmatively release its

executive's personal calendar entries.  The answer to that question is plainly no.  *See* Seaver Decl.

¶¶ 6-8.[8]

American Oversight makes essentially the same argument about meetings between the

Postmaster General and members of the Board of Governors, arguing that "at least to the extent

they are formally sitting as a board," Pl.'s Mem. at 28, USPS cannot show that good business

practice requires withholding such meeting information.  As an initial matter, the vast majority of

---

[8] For this reason Plaintiff's later argument that "a corporation and USPS alike generally give up
their ability to control whether the fact" of a meeting with external parties "is or is not publicly
disclosed," Pl.'s Mem. at 29, is similarly irrelevant.  USPS, like a corporation, does not give up
control *over its own records* merely because a fact becomes public.  And good business practice
does not require companies to release sensitive internal information merely because it becomes
public in another format.  *See* Seaver Decl. ¶¶ 6-8; *see also Wolf*, 473 F.3d at 378; *DBW I*, 2019
WL 5549623, at *8.

relevant calendar entries concern informal, non-public calls "with individual Governors." Castorina Decl. ¶ 33. The details of these non-public conversations between the Postal Service's top executive and members of its governing board, if made public, "would negatively impact the Postal Service's ability to conduct itself in a businesslike manner[.]" *Id.*[9] Setting that aside, American Oversight is wrong that USPS must release calendar entries where some of the underlying details later become public. *See DBW I*, 2019 WL 5549623, at *8 (recognizing that "most modern businesses" would not release commercially-sensitive information "even it was already public in some limited form."); *see also Wolf*, 473 F.3d at 378. Congress granted USPS the right to withhold "information of a commercial nature . . . whether or not obtained from a person outside the Postal Service, which under good business practice would not be publicly disclosed." 39 U.S.C. § 410(c)(2). The test, therefore, is not whether withheld information later becomes public in another format, but rather whether the information (1) is commercial; and (2) would be released under good business practices. *See Am. Postal Workers Union*, 742 F. Supp. 2d at 80. Plaintiff never explains why it would be a good business practice for a competitive enterprise to release its top executive's personal calendar entries, even if some informational aspect of those entries ultimately becomes public. To the contrary, Plaintiff concedes that typically "a corporation may not disclose its executives' calendars themselves" to the public. Pl.'s Mem. at 29. And that typical corporate behavior is what courts look to when assessing good business practice. *See Airline Pilots Ass'n*, 2004 WL 5050900, at *6; *see also Am. Postal Workers Union*, 742 F. Supp. 2d at 82 (explaining "good business practice" does "not rest on a conclusion of competitive disadvantage" and "instead, courts look to the common practices of other businesses").

Finally, Plaintiff argues that to establish good business practice, USPS "must demonstrate the confidential status of each calendar entry it redacts." Pl.'s Mem. at 29. But that is not the test,

---

[9] Plaintiff also argues "by extension" that that members of the public are, in effect, shareholders in USPS, but offers no legal support for this proposition. *See* Pl.'s Mem. at 28-29. Even if correct, large corporations do not release the details of calls between their executives and the board members to shareholders.

and American Oversight never offers an example of when it would be good practice for a competitive enterprise to release its top executive's calendar entries.   Regardless, USPS's declarants have amply explained that each entry on the Postmaster General's calendar is treated confidentially.  *See* Seaver Decl. ¶ 8.

### C.     The foreseeable harm standard does not apply to Exemption 3, but USPS has nevertheless demonstrated it.

American Oversight argues that USPS fails to comply with the FOIA Improvement Act of 2016, which requires the agency to show that it "reasonably foresees that disclosure would harm an interest protected by an exemption."  5 U.S.C. § 552(a)(8)(A)(i)(I).  But that Act expressly excludes Exemption 3 withholdings from this requirement, explaining that "[n]othing [in the Act] requires disclosure of information that is . . . otherwise exempted from disclosure under subsection (b)(3) [Exemption 3]."  *Id.* § 552(a)(8)(B).  USPS therefore "need not show foreseeable harm to withhold documents under Exemption 3."  *Ctr. for Investigative Reporting v. Dep't of Treasury*, No. 19-CV-08181-JCS, 2021 WL 229309, at *7 (N.D. Cal. Jan. 22, 2021) (citing 5 U.S.C. § 552(a)(8)(B)).  Plaintiff fails to explain how the reasonably foreseeable harm requirement applies to USPS's withholdings under Exemption 3.

Even if that standard did apply, Plaintiff is still incorrect.  Ms. Seaver, whose role gives her intimate knowledge of USPS's business operations, explained that releasing the withheld information "would harm the Postal Service" by providing "proprietary business information to our competitors that would benefit those competitors and cause commercial [harm] to the Postal Service."  Seaver Decl. ¶ 6.  Ms. Castorina similarly explained, without qualification, that disclosing the withheld information reveals sensitive commercial details that "would provide another company with a competitive advantage over the Postal Service, thereby disadvantaging the Postal Service and harming its business."  Castorina Decl. ¶ 17.  She further described the foreseeable competitive harm USPS would suffer if any of the nine specific categories of information over which USPS asserted Exemption 3 were publicly disclosed.  *See id.* ¶ 29 ("Releasing [strategy meeting details] would therefore harm the Postal Service by disclosing

18

sensitive business and strategic information that could aid [the] Postal Service's competitors."); ¶ 34 ("requiring the Postal Service to disclose [information about the Postmaster General's meetings with Governors] would harm the Postmaster General's ability to consult with Governors in confidence about strategic matters"); ¶ 39 (similar for details of legal meetings); ¶ 46 (similar for meetings with other federal offices); ¶ 50 (similar for meetings with industry participants); ¶ 59 (similar for meetings with OIG); ¶ 63 (similar for meetings with Congresspersons); ¶ 68 (similar for interviews).   Courts within this Circuit have approved of this approach to addressing foreseeable harm, explaining that agencies "may take a categorical approach—that is, group together like records . . . explain[ing] the foreseeable harm of disclosure for each category." *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018); *see also Stein v. SEC*, 266 F. Supp. 3d 326, 344 (D.D.C. 2017) (explaining agency may show harm by defining "functional categories," assign each redaction to a category, "and explain how the release of each category of documents" would cause harm).

The cases that Plaintiff cites help demonstrate the sufficiency of USPS's explanation of foreseeable harm.  In *Ctr. for Investigative Reporting v. CBP*, the agency offered only "three sentences, with only slight variation, as the justification for withholding" for multiple Exemption 5 assertions.  436 F. Supp. 3d 90, 106 (D.D.C. 2019).  The withholdings in *Judicial Watch, Inc. v. Dep't of Commerce* similarly contained "boiler plate language to justify the redactions."  375 F. Supp. 3d 93, 100 (D.D.C. 2019).  Unlike those cases, Ms. Castorina's declaration offers specific reasons why each category of information, if released, would harm USPS.  For example, she explained that revealing details of strategy meetings would reveal "the Postmaster General's key business priorities, the identities of the executives tasked with pursing those priorities, and elements of the Postmaster General's strategic judgment."  Castorina Decl. ¶ 28.  But with respect to meetings with Governors, she explained how, *inter alia*, disclosing such meeting information would reveal information related to the different standing committees each Governor serves on. *Id.* ¶ 33.  She offered a similarly distinct explanation for how it would be harmful to release details of the Postmaster General's meetings with industry participants, "harm[ing] the Postal Service's

ability to conduct confidential negotiations with third parties, or to teach out to customers in confidence." *Id.* ¶ 50. Ms. Castorina provided similarly sufficient and unique explanations of harm for each category of information over which USPS asserted Exemption 3. *See* Castorina Decl. ¶¶ 28-29, 33-34, 38-39, 45-46, 49-50, 53-54, 57-59, 61-63, 66-68; *accord Rosenberg*, 342 F. Supp. 3d at 78. USPS therefore has amply established "the link between this harm and the specific information contained in the material withheld." *Judicial Watch*, 375 F. Supp. 3d at 101.

American Oversight also repeats its flawed argument with respect to the Postmaster General's meetings with the OIG, *see* Pl.'s Mem. at 31, arguing that surely some meetings exclusively concern the public functions of the Postal Service. But as explained (*supra* at 9 n.5, 12-13), meetings with the OIG are likely to concern USPS's commercial functions, and even those touching upon public functions are inextricably intertwined with USPS's commercial operations. And as the D.C. Circuit has repeatedly recognized, the mere fact that the public ultimately becomes aware of a general topic, or can reasonably assume USPS is having meetings on such topics, does not mean that there is not commercial-sensitivity to release non-public, internal information about that subject. *See, e.g.*, *Wolf*, 473 F.3d at 378 ("[T]he fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption."); *ACLU v. Dep't of Def.*, 628 F.3d 612, 625 (D.C. Cir. 2011) (same); *cf. Fitzgibbon v. CIA* , 911 F.2d 755, 766 (D.C. Cir. 1990) ("[W]e have unequivocally recognized that the fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods and operations." (collecting cases)).

## II. *Exemption 5:* USPS Properly Redacted Portions of Postmaster General's Calendar Under the Deliberative Process and Attorney-Client Privileges

USPS's opening brief justified the assertion of Exemption 5 over a narrower category of information than Exemption 3. *See* Def.'s Mem. at 22-33. Specifically, USPS described how, for four categories of meetings, the deliberative process privilege and attorney-client privilege protected limited meeting details that (1) described the subject matter or goal of a meeting,

including subject matter on which the Postmaster General sought legal advice; (2) identified attendees in a manner likely to reveal the subject matter of the meeting, chill candid deliberations, or undermine the attorney-client privilege; or (3) disclosed timing information about meetings, or series of meetings, in a manner that would reveal deliberative details about the meetings. *See id.* at 22.[10]  USPS further explained that all this information is similarly protected by its Exemption 3 assertions, and that the Court therefore need only reach this issue to the extent it finds the information not covered by Exemption 3. *Id.* at 22 n.9.  Plaintiff challenges USPS's assertion of both the deliberative process privilege and the attorney-client privilege. *See* Pl.'s Mem. at 32-45.

### A.    USPS properly withheld information under the deliberative process privilege.

American Oversight alleges, in a single heading, that USPS's withholdings are not supported by its declarations, unsupported by case law, inconsistent with the practice of other federal agencies, and contrary to common sense. *See* Pl.'s Mem. at 33.  In substance, these criticisms amount to a disagreement over whether the withheld information is both pre-decisional and deliberative, which USPS addressed in its opening brief. *See* Def.'s Mem. at 23-30.  For largely those same reasons, Plaintiff's attacks miss their mark.

### 1.    The withheld information is pre-decisional.

American Oversight first contends that the withheld meeting details are not predecisional because USPS has failed to show that they were generated before adoption of agency policy.  Pl.'s Mem. at 34-36.  But materials circulated in advance of a meeting that set out the meeting's agenda and purpose are predecisional. *See Ctr. for Pub. Integrity v. FEC*, 332 F. Supp. 3d 174, 180

---

[10] Plaintiff repeatedly misdescribes the scope of USPS's redactions under Exemption 5, alleging USPS makes the "sweeping assertion" that "*every* calendar entry in each of the four broad categories described contains non-segregable, predecisional, and deliberate content in its subject line and attendee list."  Pl.'s Mem. at 39 (emphasis in original); *see also id.* at 43 (alleging USPS asserts "that every meeting within each category carries the same potential for harm").  That is not USPS's position. *See* Def.'s Mem. at 22 (explaining that USPS asserts Exemption 5 over "a subset of meetings" within four categories of documents).  The same information, as well as broader swathes of information within these four categories of documents, are properly withheld under Exemption 3. *See* Def.'s Mem. at 22, n.9.

(D.D.C. 2018) (concluding that a "meeting agenda prepared before the meeting is necessarily predecisional and inherently deliberative in that staff are suggesting the topics to be discussed at the meeting"); *In re Anthem, Inc. Data Breach Litig.*, 236 F. Supp. 3d 150, 161 (D.D.C. 2017) (concluding that "meeting write-ups are predecisional in nature"); *Am. Immigration Council v. DHS*, 905 F. Supp. 2d 206, 220 (D.D.C. 2012) (concluding meeting minutes are predecisional); *ICM Registry, LLC v. DOC*, 538 F. Supp. 2d 130, 138 (D.D.C. 2008) (information reflecting "key issues to be addressed at an upcoming meeting is deliberative and predecisional"); *see generally* Def.'s Mem. at 24-30.  The withheld calendar entries are predecisional for the same reasons.  As Ms. Castorina explained, calendar entries (and any corresponding calendar invitations) concerning strategy meetings are "pre-decisional because [they] describe information about future meetings where policy and strategy is in the process of being formulated."  Castorina Decl. ¶ 30; *see also id.* ¶¶ 19-21, 31, 35-36, 40-43, 47.

Rather than grapple with the case law above, Plaintiff argues that it does not matter if a calendar entry predates a meeting, because a meeting itself is not an agency decision.  *See* Pl.'s Mem. at 34.  But USPS's position was never that each individual meeting resulted in a final agency decision, rather that such meetings involved deliberative discussions about USPS business and strategy.  *See* Castorina Decl. ¶ 30; Def.'s Mem. at 24 ("These meetings involved deliberations over ongoing USPS business operations as well as future policies, as can be seen by the subject-matter lines on the Postmaster General's calendar.").  Courts do not require that a meeting result in a final agency decision in order to find its preparatory materials predecisional.  A document "commenting on the key issues to be addressed at an upcoming meeting" is predecisional "because it informs the positions to be taken at that meeting," regardless of whether a final decision is reached.  *ICM Registry*, 538 F. Supp. 2d at 138.  Indeed, where a record is "prepared before the meeting" to "suggest[] the topics to be discussed at the meeting" it "is necessarily predecisional." *Ctr. For Pub. Integrity*, 332 F. Supp. 3d at 180.  American Oversight offers no response to this

reasoning.[11]

Plaintiff further argues that the information is not predecisional because USPS has not identified a decision or process that the calendar entries predated. *See* Pl.'s Mem. at 35. As an initial matter, USPS need not identify a specific final agency decision associated with each meeting, but rather only the deliberative process to which the withheld calendar details relate. *See Judicial Watch v. Export-Import Bank*, 108 F. Supp. 2d 19, 35 (D.D.C. 2000) ("[T]he agency need not point to an agency final decision, but merely establish what deliberative process is involved, and the role that the documents at issue played in that process." (citing *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1223 (D.C. Cir. 1989)). USPS has done that here, explaining that the "information is pre-decisional because it describes information about future meetings where policy and strategy is in the process of being formulated." Castorina Decl. ¶ 30; *see also* Def.'s Mem. at 24-30. Indeed, USPS has only applied redactions under Exemption 5 in limited instances where the entry "describe[s] the subject matter or goal of a meeting," where "attendee information . . . is likely to identify the subject matter of a meeting or chill candid deliberations," or where "timing information about certain meetings, or series of meetings . . . would reveal deliberative details about those meetings." Castorina Decl. ¶ 21. In other words, USPS has only redacted entries under Exemption 5 that reveal deliberative details of the meeting and it therefore has "establish[ed] what deliberative process is involved." *Judicial Watch*, 108 F. Supp. 2d at 35.

Finally, American Oversight claims that USPS has not met its burden of showing that the materials are predecisional because, in some instances, it has withheld the identities of the parties involved in meetings. *See* Pl.'s Mem. at 35. But it is not the names of the individuals involved that is relevant to assessing whether the materials are predecisional, but rather "the positions in the

---

[11] Plaintiff, in a footnote, cites to *Climate Investigations Ctr. v. Dep't of Energy* No. 16-CV-124, 2017 WL 4004417, at *10 (D.D.C. Sept. 11, 2017). *See* Pl.'s Mem. at 35 n.27. The court there found that emails were not predecisional where they did "not even identify the topic of the meeting." *Id.* But USPS's redactions are limited to calendar entries that describe the subject-matter or goal of a meeting, or otherwise reveal deliberative meeting details. *See* Castorina Decl. ¶ 21.

chain of command of the parties to the documents." *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982) (citing *Taxation With Representation Fund v. IRS*, 646 F.2d 666, 678 (D.C. Cir. 1981)); *see generally Access Rep. v. DOJ*, 926 F.2d 1192, 1195 (D.C. Cir. 1991); *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 868 (D.C. Cir. 1980). USPS has provided that information for each category of information over which it asserts Exemption 5. As Ms. Castorina explained, these meeting entries are "between the Postmaster General and other Postal Service leadership, his legal counselors, a Postal Service Governor, or other federal agencies or offices." Castorina Decl. ¶ 21; *see also id.* ¶ 31 (explaining why Exemption 5 applies to meetings "between the Postmaster General and Postal Service leadership about the policies, strategy, and other business pursuits of the Postal Service"); *id.* ¶ 36 (similar for meetings between Postmaster General and Governors); *id.* ¶¶ 40-42 (similar for meetings between Postmaster General and attorneys); *id.* ¶ (similar for meetings between Postmaster General and other federal agencies). USPS therefore has sufficiently described "[t]he identity of the parties," *Coastal States*, 617 F.2d at 868, by clearly identifying their respective "positions in the chain of command," *Arthur Andersen & Co.*, 679 F.2d at 258.

### 2.     The withheld information is deliberative.

USPS redacted a limited and specific set of calendar details where releasing such information would reveal deliberative information about the meetings. *See* Def.'s Mem. at 22, 25-30. Specifically, USPS's redactions were limited to subject-matter details identifying the substance of what was to be discussed a meeting, meeting attendee information likely to identify the subject matter of a meeting, and timing information that would reveal substantive deliberations. *Id.* at 22.

Plaintiff disputes these withholdings, first, on the basis that these categories of information are unlikely to contain the sort of deliberative details the privilege is intended to protect. *See* Pl.'s Mem. at 36-37. Revealing certain subject-matter headings, however, would "identif[y] the substance of what the Postmaster General intended to discuss at the meetings he attended." Def.'s Mem. at 25. Such information is deliberative. *Id.* Timing and attendee information may similarly be deliberative where, as here, disclosing it is likely to reveal the Postmaster General's opinion

about an attendee or disclose the substance of the meeting.  *See id.* at 25-28.[12]  American Oversight argues that is not enough, and that the information must "reveal commentary or proposals."  Pl.'s Mem. at 37.  But that is not the test.  Rather, the issue is whether "disclosure would inevitably reveal the government's deliberations" or "expose an agency's decision making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions."  *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 135 (D.D.C. 2011) (citing *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *Quarles v. Dep't of the Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990)); *accord Montrose Chemical Corp. of Ca. v. Train*, 491 F.2d 63, 71 (D.C. Cir. 1974) ("Exemption 5 was intended to protect not simply deliberative material, but also the deliberative process of agencies.").  As Ms. Castorina explained, the information withheld under Exemption 5, if released, would expose "the Postal Service's deliberative process in several ways," including by revealing the topic, agenda or goal of meetings between the Postmaster General and others, disclosing the substance of meetings by identifying attendees associated with specific areas of USPS policy, or timing information (including the recurrence or non-recurrence of meetings) that reveals aspects of the USPS decision making process and the Postmaster General's role in that process.  *See* Castorina Decl. ¶ 21.  As she further explains, revealing this information would "chill frank discussion within [the] Postal Service." *Id.* ¶ 31; *see also id.* ¶¶ 30-31, 35-36, 40-42, 47.

Courts have previously found such information deliberative where it "reveals what the agency is considering" and "discusses the timing and level of executive branch involvement for a decision." *PEER v. Office of Science & Tech. Policy*, 881 F. Supp. 2d 8, 17 (D.D.C. 2012) (finding meeting agenda's to contain deliberative information).  Plaintiff attempts to distinguish *PEER* by arguing that case turned on the fact that the agendas at issue contained proposed processes and policies.  *See* Pl.'s Mem. at 37.  The redacted calendar entries similarly "provide details about

---

[12] Plaintiff makes no similar effort to distinguish the numerous cases cited by USPS finding that, attendee and timing information can be protected by the deliberative process privilege.  *See* Def.'s Mem. at 25-28.

meetings between the Postmaster General and Postal Service leadership about the policies, strategy, and other business pursuits of the Postal Service."  Castorina Decl. ¶ 31.  More importantly, the *PEER* decision stressed that "[t]he 'key question' in identifying 'deliberative' material is whether disclosure of the information would 'discourage candid discussion within the agency.'"  *PEER*, 881 F. Supp. 2d at 17 (quoting *Access Rep. v. DOJ*, 926 F.2d 1192, 1194 (D.C. Cir. 1991)).  The court found that releasing the meeting agendas at issue would discourage candid discussion with the agency by "reveal[ing] the specifics of how the [agency group] makes decisions on a particular issue."  *Id.*  The same is true here, as disclosing the calendar entries at issue would "reveal[] which Postal Service executives and other subordinates are consulted on specific topics . . . , identify key decision-makers within the Postal Service, and chill frank discussion within Postal Service by publicly identifying specific individuals with specific policies."  Castorina Decl. ¶ 31 (further explain release would grant "allow extensive insight into the mechanics of Postal Service decision making, including what role the Postmaster General plays in formulating strategy").  Moreover, even if American Oversight is right that certain cases have upheld Exemption 5 withholdings where a meeting agenda *commented* on topics, that is by no means the outer limit of the deliberative process privilege.  To the contrary, a "meeting agenda prepared for the meeting is necessarily predecisional and inherently deliberative" because it shows that "staff are suggesting the topics to be discussed at the meeting."  *Ctr. For Pub. Integrity*, 332 F. Supp. 3d at 180.[13]

Plaintiff also argues that USPS did not sufficiently describe the individuals involved in the

---

[13] Plaintiff also suggests USPS's position is an outlier among executive agencies.  *See* Pl.'s Mem. at 38.  While Plaintiff cites two calendars released by other agencies with allegedly fewer Exemption 5 withholdings, it cites no actual authority for this claim.  *Id.* at 38 n.29.  "The fact of disclosure of a similar type of information in a different case does not mean that the agency must make its disclosure in every case."  *Salisbury v. United States*, 690 F.2d 966, 971 (D.C. Cir. 1982).  And as discussed *infra* in Section IV, courts within this Circuit have on numerous occasions recognized that, at least under some facts, calendars do not even qualify as agency records and thus need not even be released.  Finally, as explained *supra* at 2, USPS is not an ordinary public agency, further diminishing the limited relevance (if any) of another agency's practices.

meetings at issue, or their decision-making authority, although it acknowledges that USPS's categorical approach provides some information about the kinds of individuals involved. *See* Pl.'s Mem. at 40-41. For similar reasons above (*supra* at 23-24), this misses the point. Ms. Castorina's declaration provides adequate information about the relative rank of the individuals involved in these meetings. For example, some meetings occurred between the Postmaster General, on the one hand, and on the other "subordinates, aides, counsels, and other Postal Service executives" who are, naturally, below the Postmaster General in decision-making authority. Castorina Decl. ¶ 28; *see also id.* ¶ 31. By contrast, other meetings occurred between the Postmaster General and either "individual Governors of the full Board of the Governors." *Id.* ¶ 33; *see also id.* ¶ 40 (explaining certain meetings occurred between Postmaster General and USPS attorneys); *id.* ¶ 44 (similar for meetings between Postmaster General and other federal agencies). This case is not, therefore, like *Ctr. for Investigative Reporting*, where the court found the agency did not "identify[] 'the relation between the author and recipients of the document.'" 436 F. Supp. 3d at 103 (citing *Access Rep.*, 926 F.2d at 1195). Ms. Castorina has specifically identified and categorized the entries at issue based on the relationship between the other meeting attendees and the Postmaster General. *See* Castorina Decl. ¶ 26.[14]

3.     *Releasing the withheld deliberative information would harm USPS.*

Ms. Castorina's declaration is replete with discussion of the foreseeable harm that would occur if this information is released. For example, it would "disclose the substance or mechanics of Postal Service deliberations," including by disclosing meeting topics, disclosing the Postmaster General's judgment about who to consult on particular matters, and exposing the degree of the

---

[14] Finally, Plaintiff cites (at 41) to this Court's decision in *Prop. of the People, Inc. v. OMB*, which concluded that certain meeting details were not deliberative. *See* 330 F. Supp. 3d 373, 383 (D.D.C. 2018). But as USPS previously explained, that decision relied at least in part on the fact that the plaintiff in that case did not challenge the agency's decision to withhold the subject matter of the meetings at issue, diminishing the harm of releasing attendee and timing information. *See* Def.'s Mem. at 28-29. But that is not the case here, as American Oversight specifically argues such subject-matter information must be released. *See* Pl.'s Mem. at 37-40. Plaintiff offers no response to this distinction in its brief.

Postmaster General's involvement in formulating specific policies.  *See* Castorina Decl. ¶ 21.  She similarly provided specific examples of harm that would occur for each category of information over which USPS asserted Exemption 5.  For example, revealing details about meetings between the Postmaster General and his subordinates would "reveal the substantive business discussions of the Postal Service" and further "reveal[] which Postal Service executives and other subordinates are consulted on specific topics . . . , identify key-decision-makers within the Postal Service, and chill frank discussion within [the] Postal Service."  *Id.* ¶ 31.  Similarly, disclosing meeting details between the Postmaster General and Governors would reveal different deliberative aspects of USPS, including "how often the Postmaster General speak with the Board of Governors, which Governors he speaks to and on what topics, and when consultations with the Board of Governors occur[] relative to subsequent" USPS decisions, "reveal[ing] critical mechanics about Postal Service decision making at the highest level."  *Id.* ¶ 36.  Releasing certain details about meetings with attorneys "would [] chill the ability of the Postmaster General to communicate candidly with the Postal Service's attorneys" and "reveal[] what subjects the Postmaster General sought legal advice about."  *Id.* ¶ 42; *see also id.* ¶ 47 (explaining disclosure would "chill frank discussion and communication between agencies").

Nonetheless, American Oversight contends that USPS has not adequately demonstrated that it reasonably foresees harm to a protected interest if this information is released.  *See* Pl.'s Mem. at 41-43.  This argument fails for essentially the same reasons above.  *See supra* at 18-20.  Ms. Castorina's explanations are far more extensive, detailed, and specific than the "three sentences, with only slight variation, as the justification for withholding" in *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106, upon which Plaintiff relies..[15]  Again, USPS has established "the link between this harm and the specific information contained in the material withheld."  *Judicial Watch*, 375 F. Supp. 3d at 101.

---

[15]  Plaintiff also incorrectly argues, in a footnote, that the significant public attention to USPS during the time period of its request lessened any harm caused by releasing the calendar entries at issue.  *See* Pl.'s Mem. at 42 n.30.  *See Wolf*, 473 F.3d at 378; *DBW I*, 2019 WL 5549623, at *8.

###### B.     USPS properly withheld information under the attorney-client privilege.

USPS previously explained why certain details concerning meetings between Postmaster General DeJoy and his legal counselors are also properly withheld under the attorney-client privilege. *See* Def.'s Mem. at 30-33. Plaintiff acknowledges it is "possible for a calendar entry to contain genuine attorney-client privileged material," Pl.'s Mem. at 44, but contends that USPS has not met its burden in demonstrate that here. But USPS's opening brief sets out how the entries at issue meet each element of the attorney-client privilege—(1) the Postmaster General and USPS are clients; (2) the information at issue concerned communications between the Postmaster General and attorneys; (3) the calendar entries contained facts sent to counsel for purpose of securing legal advice; and (4) the privilege has been claimed and not waived. *See* Def.'s Mem. at 30-33. American Oversight does not contest any of these particular assertions, but instead speculates—incorrectly—that "it is difficult to conceive how the sorts of information typically contained in a calendar entry would" reveal client confidences because "descriptions are typically at a high level of generality." Pl.'s Mem. at 44. To the contrary, a calendar entry can contain "information that would reveal the substance of a client's request for legal advice," which "remains privileged." *Pub. Citizen, Inc. v. DOE*, 388 F. Supp. 3d 29, 42 (D.D.C. 2019) (further explaining that "[r]eleasing the name of the attorney who was consulted as part of Defendant's decision-making process would necessarily reveal information about Defendant's decision-making process").[16] American Oversight offers no persuasive reason to second guess the agencies assertion of the attorney-client privilege over limited calendar details.

---

[16] For that reason this case is also different from *Hunton & Williams LLP v. EPA*, 248 F. Supp. 3d 220, 254 (D.D.C. 2017). The court there found the agency improperly applied the privilege "where the lawyer was merely carbon-copied, rather than an active participant." *Id.* at 253. By contrast here, the calendar entries concern "meetings between the Postmaster General and his legal team" and "communications from a client to an attorney for purposes of obtaining legal advice." Castorina Decl. ¶¶ 40-41. Plaintiff also, without explanation, cites *Pub. Citizen* as favorable precedent, but that decision concluded the agency properly withheld email subject-matter lines under the attorney-client privilege and Exemption 5. *See Pub. Citizen*, 388 F. Supp. 3d at 42.

**III.**   *Exemption 6:* **USPS Properly Withheld The Names of Job Applicants.**

American Oversight "does not challenge most of the redactions USPS has applied under Exemption 6,"[17] but does contend that Exemption 6 does not protect the identities of successful job applicants.  *See* Pl.'s Mem. at 45.  Even assuming that Plaintiff is correct that government workers typically do not have a privacy interest in the fact of their employment, that does not extend to the details surrounding their *interview* with the Postmaster General.  *See* Castorina Decl. ¶ 69.[18] Moreover, Plaintiff has not explained how this information would contribute to the public's understanding of Postal Service operations, as required under Exemption 6.  *Id.*; *see also Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 674 (D.C. Cir. 2016) ("[T]he only relevant public interest in disclosure to be weighed in this balance is the extent to which disclosure would serve the core purpose of the FOIA, which is 'contributing significantly to public understanding of the operations or activities of the government." (quoting *Dep't of Def. v. FLRA*, 510 U.S. 487, 495 (1994)).

The sole case relied upon by American Oversight, *Core v. USPS*, concerned a specific request for "employment histories of applicants for federal employment."  730 F.2d 946, 947 (4th Cir. 1984).  The court determined that this information could be released for successful job applicants, but not unsuccessful ones, because there was a sufficient public interest "in the competence of people the Service employs and in its adherence to regulations governing hiring." *Id.* at 948.  But American Oversight's request here is not narrowly targeted towards these kinds of employment records, nor has it proffered a similar public interest in this information.

Courts within this Circuit have also come out the other way from *Core*.  For example, in *Neary v. FDIC*, the Court upheld withholding "the full names and addresses of applicants . . . , the applicants' interview dates, and the applicants' hiring status," without any distinction between

---

[17] American Oversight also does not challenge any of the agency's withholdings under Exemption 7(c).  *See* Pl.'s Mem. at 6.

[18] For that reason, the identities of successful applicants are still exempt from disclosure under Exemption 3, as revealing their identities would disclose commercially-sensitive information about the Postmaster General's role in hiring.  *Id.* ¶¶ 66-69.

successful and unsuccessful applicants.  104 F. Supp. 3d 52, 57 (D.D.C. 2015).  As here, the plaintiff in *Neary* had "not shown an overriding public interest to compel disclosure of the exempt information."  *Id.* at 59.  Because American Oversight has not articulated a public interest in this information, it remains properly withheld under Exemption 6 (as well as Exemption 3).

## IV.    USPS Properly Adopted A Categorical Approach To Redacting Postmaster General DeJoy's Calendar

Finally, Plaintiff disputes USPS's approach to redacting the Postmaster General's calendar, going so far as to baselessly impugn the agency's good faith.  *See* Pl.'s Mem. at 6-10.

*First*, Plaintiff challenges USPS's decision to identify specific calendar redactions by category, rather than by labelling the calendar itself.  *See* Pl.'s Mem. at 7.  But Plaintiff fails altogether to explain how this approach deprives it of sufficient information to assess the agency's assertion of various exemptions.  In fact, the agency's categorization approach offers Plaintiff more information than merely labelling hundreds of interchangeable black boxes on a calendar with generic terms like "Exemption 5" or "Exemption 7(c)."  A digital calendar readout, containing numerous boxed appointment entries, is not like an email or memorandum, where un-redacted portions of the document may offer context about specific asserted exemptions.  *Cf. Physicians for Human Rights v. Dep't of Def.*, 675 F. Supp. 2d 149, 170 (D.D.C. 2009) (explaining that "surrounding context" gave reviewer context about redactions to reports).  For that reason, this Circuit has blessed a "category-of-document" approach provided that each category is "sufficiently distinct to allow a court to determine whether the specific claimed exemptions are properly applied."  *CREW v. DOJ*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (citing *Gallant v. NLRB*, 26 F.3d 168, 173 (D.C. Cir. 1994)).  The agency met this burden by offering two detailed affidavits in support of its motion, including Ms. Castorina's 87-paragraph declaration that set out twelve distinct categories of appointments, *see* Castorina Decl. ¶ 26, and then for each category explained the specific exemptions asserted and the basis for those exemptions, *see id.* ¶¶ 27-78; *see also* Def.'s Mem. at 38-39.  Ms. Castorina's declaration further set out the agency's basis for adopting a categorical approach over an entry-by-entry approach.  *See id.* ¶¶ 79-87.  As Ms. Castorina

explained, "[m]erely labelling the redactions on the Postmaster General's calendar offers no additional explanation or detail about the asserted Exemptions," and Plaintiff is therefore "not prejudiced by the production of the calendar in this manner." *Id.* ¶ 87. Indeed, Plaintiff offers no explanation as to how mapping these categories to identical black boxes corresponding with appointment entries on the calendar would help it assess the exemptions. Plaintiff offers no substantive critique of the agency's use of the categorical approach and identifies no prejudice to itself. *See* Pl.'s Mem. at 7-8.

Plaintiff suggests that the agency's initial determination that the calendar was a "personal record" somehow undermines its subsequent redactions to the calendar, going so far as to say that this "potentially" calls into question the agency's "good faith." *See* Pl.'s Mem. at 8-9. Courts within this Circuit, however, have found calendars maintained in the workplace to not be agency records for purposes of FOIA. *See, e.g.*, *Bureau of Nat. Affs., Inc. v. DOJ*, 742 F.2d 1484, 1496 (D.C. Cir. 1984) (concluding physical desk calendar maintaining work appointments was not an "agency record" because it was kept for personal convenience and not widely distributed); *Consumer Fed'n of Am. v. Dep't of Agriculture*, 455 F.3d 283, 293 (D.C. Cir. 2006) (finding electronic work calendar maintained on office computer not to be an "agency record" where calendar was only accessible to user and his secretary) (Garland, J.); *Bloomberg, L.P. v. SEC*, 357 F. Supp. 2d 156, 163-164 (D.D.C. 2004) (finding that electronic work calendar on SEC computer was not an agency record where it was maintained for personal convenience and not widely distributed). Like the calendars in these cases, Postmaster General DeJoy's calendar is maintained for his personal convenience and is not widely accessible within the agency. *See* Castorina Decl. ¶ 10 (noting that "only a small circle of aides . . . have access to the details of the Postmaster General's calendar"); *see also* Seaver Decl. ¶¶ 7-9. USPS, therefore, had a good faith argument that the calendar was not an agency record. Nevertheless, the agency agreed to process it. *See* Def.'s Mem. at 3-4.

Plaintiff also misconstrues USPS's position, claiming that USPS asserted the calendar was not an agency record because it was comprised of personal appointments. *See* Pl.'s Mem. at 8-9.

But that was never USPS's position.  Rather, as the agency explained in its appeal decision, the calendar is not an agency record because "the Postmaster General maintains a calendar with both personal and business entries" and it "is only made available to his immediate staff and is not distributed to other members of the organization."  Castorina Decl., Ex. 1 at 2 (Appeal Decision). In other words, the agency determined the calendar to be personal because it was maintained for the Postmaster General's personal convenience, not because it only concerned personal matters. *Id.*[19]  The Court should reject American Oversight's effort to distract from the merits of the parties' cross-motions by focusing on USPS's initial determination—no longer an issue—that the calendar is not an agency record.

## **CONCLUSION**

For the foregoing reasons, USPS respectfully requests that the Court grant its cross-motion for partial summary judgment and deny Plaintiff's cross-motion for summary judgment.


Dated April 2, 2021

Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

ELIZABETH J. SHAPIRO
*Deputy Director*

/s/ *Christopher D. Dodge*
CHRISTOPHER D. DODGE
(MA Bar No. 696172)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

*Counsel for Defendant*

---

[19] Plaintiff's suggestion that the calendar contains no personal entries is also incorrect.  *See, e.g.*, Castorina Decl., Ex. 3 (Calendar) at 1 (un-redacted "Personal Time" entry for June 1); *id.* ¶¶ 75-78.